Thank you, Your Honors. My name is Morris Hill. I represent the eight individual sheriff's officers who are the appellants in the Interlocutory Appeal as to Qualified Immunity. As you know, there are three issues that we are here for. The first issue being the issue of Qualified Immunity as to causing Kristen's death, Kristen being the wife who was shot by her husband. That breaks down two ways. One way is whether there was a special relationship that was breached at the constitutional level. The other is whether there was danger creation under DeShaney and its progeny. I'm not going to say very much about special relationship because that does not seem to be a very serious issue in this case. The deputies were responding to an emergency call and there's no authority, no clearly established law that that in itself creates special relationships. The more important issue in this case is danger creation. And our argument is that there is certainly in the context of the hyper-pressurized environment where you have people treating a person who's been injured, you don't have clearly established law saying that something that a law enforcement officer may do that may delay a medical response creates a danger not otherwise present that in this case would have caused death. Well, I have to say it. At some point, and we need to be cognizant of what our appellate jurisdiction is, it's not for us to second guess whatever factual determinations have been made by the district court, including a determination there's a genuine issue. We take the case as presented, as alleged by plaintiffs. And there is, there seems to be evidence that would support the proposition that the ambulance was not allowed to leave because of actions by the deputy sheriffs. How is that not something that's clearly established as something the sheriff shouldn't do? The problem is, Your Honor, that the idea that a peace officer can delay medical care is something that, while in the abstract sitting here in the courtroom may sound very unusual and a very clear issue one way or the other, out there in the field it happens every day. It's called staging. That's when there's been a violent incident, somebody gets shot, and we don't have the shooter under control yet or more or less. Now, wait a minute. In the facts of this case, it was known exactly who the shooter was. The shooter identified himself. The shooter himself was the deputy sheriff, the husband of the victim. My point is... So what possible reason could there be to halt the ambulance from going? Well, there was no reason. That's why they didn't do it. And there's no evidence... But we've got an allegation that that's what happened. You've got an allegation, but this is summary judgment time. We have evidence that would support the proposition that's what happened. You don't have any evidence that says the ambulance was delayed by any sheriff's deputy. Well, let's assume for the moment that we take the facts as stated by the non-moving party that there was evidence that it was delayed. Is that enough? Does there have to be a showing of deliberate indifference? And was there deliberate indifference evidence shown? Well, Judge Aikori, you just hit a very important issue here. Because what we're really talking about, and the way to get through this dilemma of staging and how do you distinguish that and so forth, is that you're looking, what is really the standard here? How do you determine when it's okay to delay medical care versus it's not? And what standard do you as a judge apply in a circumstance like that to determine whether clearly established law has been violated? That's where we have no clearly established standard so far. Should it be deliberate indifference? You could make an argument that way, but the other side of that argument is that in a hyper-pressurized situation, you don't have the chance for you've got a Porter v. Osborne situation where you've got things going on. And in that situation, the Supreme Court tells us the standard ought to be unrelated to any legitimate law enforcement need, has, you know, for the very purpose of causing harm. Even on a deliberate indifference standard, you've got to, the officer has to make the, has to make the inference, has to reach the inference that if, that what he is doing is going to cause the harm in question. So it really boils down to. And was there evidence on that point? There was no evidence. Even taken in the light most favorable to the Maxwells? One of the very difficult challenges of litigating this case is that they just, you know, this was all allegations and there was no evidence. The best way to see what the evidence was on was the ambulance delayed is to look at the oral argument where Mr. Osterberg, who was representing the Alpine defendants who are not here today because their part of it is not on appeal, at least not yet, where Mr. Osterberg repeatedly said, and he's representing the ambulance people, repeatedly said there isn't a shred of evidence, not a shred of evidence, that any sheriffs delayed or did anything to delay the ambulance. And that was, if plaintiff had the evidence, you would have heard about it. But that's arguing a summary judgment that's not before us, the denial of summary judgment by the district court. District court didn't say there's not a shred of evidence, you win based on that. District court says it's a genuine issue, material fact, and that's not in front of us. Yes, but there has to be some looking at is the district court's judgment, is the district court's opinion supported by anything. Otherwise, you know, what's the point of appealing a qualified immunity ruling if a district court can say I decide that there's a triable issue of this and there's no evidence at all? Well, sometimes there's not appellate jurisdiction. Well, the – I mean, ordinarily you get a denial of summary judgment, you have exactly that complaint, but you don't have appellate jurisdiction. Well, that's why we – Qualified immunity changes that, but only as to the qualified immunity issue. That's why we have gone the other way. Recognizing what you have said is a good point. What we have done, Judge Clifton, is to focus on what is the legal standard and does the evidence, even assuming that the plaintiff's evidence is true, meet the legal standard. And that's where we again hit the rocks, because there is no clearly established law saying exactly how do you go about determining when an officer delays medical care, does that create a danger? The danger creation cases all talk about you create a danger that wasn't there. When a law enforcement officer delays an ambulance for a second, a minute, whatever, that's not creating a danger that doesn't already exist. So we would have to say that it was not – you would need us to say it was not clearly established that officers delaying an ambulance for, I think, the – Maxwell's argument for a matter of 10, 15 minutes was – created a danger or was a violation of Kristen Maxwell's due process rights. Is that what we would need to conclude? That it was not clearly established? You would have to conclude that it was – that there – that it's not clearly established that under the general circumstances that face the officers that day, which is an emergency medical response, that delaying for – delaying an ambulance is a creation of danger that does not ordinarily exist. And I don't want to repeat the briefing, but I did try to break it all down as far as what all the danger creation cases that have been decided thus far have said. You can go to – if you're interested, there's – other circuits have looked at it a little differently. In the Third Circuit, for example, they talk about the hyper-pressurized environment. And there's a case from there at – the Sanford case at 456 F. 3rd, 298, where they come up with their take on what should be the way you determine what the standard is for danger creation in these pressurized situations where it's not – you really can't say it's deliberate indifference because they don't really have a – they're not deliberating here, should we delay this ambulance because whether or not it's going to interfere with this woman's medical condition. In the second – I'm sorry. No, I was going to ask you, how did you define the pivotal questions before us? How do you define them? What is the question? The issue is whether there's clearly established law saying that any – for whatever reason, any delay in an ambulance, let's say, at a hot crime scene is a constitutional violation. And we don't – we're not there. We don't have that because the – you would have to create a danger that isn't there already. That's under the danger creation standard. In your few seconds, could you just discuss why it wasn't clearly established that you couldn't – that the deputies couldn't detain the Maxwells under these circumstances? Is there any case – we have a number of cases indicating it's okay to do it where there's a search warrant, but there was no search warrant here. Well, there was a – well, they didn't have the search warrant yet. They had to get the search warrant. In the Mueller-Rumina case, they came armed with a search warrant. That wasn't possible in this case, but they still had to freeze the scene until they got the search warrant. But absent a search warrant, what would be – what would allow them to do it? Isn't it clearly established you can't detain people under the Fourth Amendment? The ward case is as near as you have to that, and that's a vastly different situation. What we've got here is a hot crime scene, and we've got the officers having their one and only best opportunity to gather the evidence. When you try to put a time limit on how long they can detain people, I don't think there's any question they can detain people under those circumstances. You see the shooting has just taken place, and you're going to walk in there, and the guy says, yeah, well, I was here, but I'll see you. Bye. I don't think there's any common-sense question that you have the right to detain people. The question is for how long, for what purpose, and what is the standard that you as a judge have to apply? Well, right. And, of course, but right now, Judge Aikuda is asking me a question about what's really a completely separate issue in the case, which doesn't – I mean, it's the same – it comes up in the same case, but it's a completely different issue, which is how long can you detain someone at a hot crime scene? And there is no clearly established law on that, and I think you can't it would be a vast mistake for judges to try to start saying you can do it for half an hour, you can do it for two hours, you can do it for five hours, because it's always going to depend on the circumstances. What you really need to do is work out a standard for how you determine, you know, like is this – is what they're doing unrelated to law enforcement purposes? Is it unrelated to their investigation? Because it can take a much longer time. In this case, each of the plaintiffs was interviewed for about an hour, and all the interviews were completed within six hours of the offense. Now, I, as an attorney, on my signature alone, without a judge's approval, can sign a deposition subpoena and sit somebody down for seven hours minimum and ask them questions. And I can make them travel 100 miles to my office to do so under the rules. Now, investigating a homicide is a lot more important than taking a deposition. And once we start saying that you can't detain somebody for an hour or two hours for something as important as investigating a homicide, the – it's out of proportion to the importance of what they're doing. So I don't think you can ever set up a time limit or, you know, this is how long you can detain, this is how far. We've got this Parr case from the Ninth Circuit from a few years ago that says if you take somebody to the police station, that's an arrest and you shouldn't be doing that. Well, you know, I can't tell you to overrule Parr, but that doesn't make much sense to me in the context that it might be raining out there, it might be uncomfortable, and maybe the most sensible thing to do is take the witnesses to the police station where you can sit them down and interview them. So it's just a – it's almost like a question of what makes sense and what's the best way to do it. And from your point of view, it's what standard do I look at to – as a judge to see is what they've done constitutional. The – I guess I'm out of time. We've got your argument. We'll hear from the appellees. Thank you. May it please the Court. Daniel Benjamin on behalf of the plaintiffs. Counsel spent most of his time on the issue of the delay of the ambulance, so I wanted to address that first. The most important point here, as counsel I think eventually admitted, is whether or not there's clearly established law, because as the Court pointed out, we don't go back into the district court's findings. There is clearly established law here. It's under four different cases under the deliberate indifference standard. We have – well, phonetically it would be Penilla, but I think it's perhaps Penilla case. In that case, 9-11 had been called. So we had 9-11 on its way. The officers arrived. The man was seriously ill. For whatever reason, they called off 9-11 and they locked the individual in his house, where he eventually died. That seems somewhat different in this case. So I looked at all of the cases that were cited in the briefs, and there wasn't anything exactly like this, where the taking the allegations as true or the facts alleged as true, there was the confusion of the crime scene and the deputies delayed the ambulance leaving for, it looked like, 10 to 15 minutes. So that doesn't seem comparable to the Penilla case, where they actually conceal him from view and lock the door for whatever reason. So given that there isn't anything on point, how can we say that it was clearly established that this 10 to 15 minute delay was, they should have known that that was not, that that was violating her due process rights? Well, Your Honor, to address first that question, but I want to return to whether or not there's law that's on it, it's clear we don't need the exact same facts. And that's the Anderson v. Creeching case out of the U.S. Supreme Court, has said we don't need the exact same facts. In fact, in Hope v. Pelzer, they even said in not completely novel circumstances it can be obvious enough that something violates the Constitution. And here we do have extremely outrageous facts based on the district court's finding. We have a finding that a gunshot victim who had been shot in her jaw, in essence she was sitting in the kitchen for a good 10 to 15 minutes. The air ambulance actually flies over the house to the landing zone. They knew when that air ambulance was going to leave. They know they have a gunshot victim that's supposed to transport her within 10 minutes. The ambulance arrived at 1108. They should have been moving her out by 1118. They don't even leave the house until 1130. Of course, by the time they make it to the air ambulance with its superior medical options, unfortunately Kristen was deceased. So we have very outrageous facts. We also have, whether it's the Pena case, we also have several other cases from this circuit, the Wood case, the Munger case, the Grubb case. There's a series of cases, Your Honor, that at minimum establish, certainly in Pena, in Wood and Munger, all three of those cases involved people who already were at risk. In Pena, he already was ill. In Wood and Munger, the decedents, well, one was a decedent and one was a rape victim, but both of them were severely intoxicated. So the officers already knew they were at risk. They made the risk worse, which is exactly what happened with Kristen, and the court held that there was clearly established law sufficient to put a reasonable officer on notice, and that's all we need here. We don't need the exact same fact pattern. Did there have to be a showing of deliberate indifference on the part of the officers, and if so, what was the evidence here? Your Honor, it does have to be deliberate indifference. That is the standard under the court's rulings. I do believe that the district court at least found a question of fact. The court's decision, district court's decision, cited several pieces of evidence we actually had placed additional. First of all, of course, is the delay of the ambulance. When the ambulance arrived, several witnesses testified it was turned off. Again, this is a gunshot victim. They're turning off the ambulance. It's just sitting there. Jim Maxwell then hears the deputy say, nobody is leaving. This is a crime scene. He believes that this was heard by the paramedics. We then, of course, have Sergeant Canabi, who testified to the fact that the next day during a meeting regarding the shooting, his fellow deputy, Deputy Jackson, yelled at him that he, quote, effed up the crime scene. And he had yelled at me, you know, I was so concerned with the crime scene, I didn't want to let the ambulance leave. So there's evidence that they didn't want to let the ambulance leave. Is that enough, though, for deliberate indifference? I thought they have to know that they're creating a risk for the individual and nevertheless intentionally do so anyway. Well, Your Honor, I think that you know, if you have a gunshot victim bleeding from the jaw, that you're creating a risk if you hold that person. But this is an obvious risk. This is an obvious risk. This is not a hidden risk. It's not as though she had some unknown medical condition. I could see that set of facts where you delayed somebody to try and get their testimony or whatever other purpose, and you just didn't know that they had a medical condition. Nobody said anything or the like. But when you have somebody shot through the jaw, there's no ambiguity here that you should not be holding up. We don't know what she was doing, but it's pretty apparent from this record that nobody really knew the condition was as threatening as it turned out to be. Well, Your Honor, any gunshot victim, it's always a threat. It's always a danger.  So, I mean, these are tragic circumstances. What on this record said she was bleeding? That actually is the description from, if you look, Your Honor, at the decedent. Well, our expert, for example, is quoted in district court ER-12. Decedent clearly had a life-threatening injury from both the standpoint of I guess my words for that would be bleeding profusely, but acute hemorrhage would be the same thing, Your Honor. There was further testimony in the record as to bleeding. And, of course, the county's own medical expert, whereas we believe that there were dual causes of this death, it was both the delay and the bleeding as well as the treatment, the county's expert's theory was that this was purely based on bleeding to death. So I think, Your Honor, there's a pretty clear record on that point. If the court has no more questions with regard to that point, I did want to turn to the search issue and the detention and separation of the Maxwells. One point I wanted to make very clear here, we have two things that occurred to the Maxwells. One was that they were detained. And, again, there's district court findings of that detention. The other is that this family was separated. We have the grandfather who's placed at the top of the driveway away from his wife and his wife's father and the kids who were then placed in the mobile home. They're detained in that way for six hours. So the family was kept apart. And we know that they were kept apart by force, of course, because force was then used on Jim Maxwell when he was pepper sprayed, when he was struck with a baton and the like for trying to see his wife. We have these cases, which Mena and then our cases, Dawson and Ganwich, which suggest at least when you have a search warrant, the police are entitled to detain the people who they're not suspected of criminal activity for various police purposes. And the counties explained, well, the police purposes here were to question them, to prevent them from exchanging information that might contaminate the evidence or to interfere with the crime scene. And so I'm looking at whether there's no case directly on point, because these cases all had search warrants, but I'm looking for the case that says, no, if you don't have a search warrant, you can't detain and use police reasoning to question them or to keep them separate. Well, yes, Your Honor. So what we do have, of course, is the word decision, unblocked decision of this court, saying you can't just generally detain witnesses to question them. But that was one where they flagged someone down, right? But that's not comparable to the crime scene case, is it? Well, it doesn't have to be exactly the same again, Your Honor. We don't have to be on exact matching facts. But there's no crime suspected at all. They just flagged the guy down in his car so they could interview him about Mr. Ayers. Yeah, because they suspected another crime might have been committed by someone else. This is a witness to a crime, the same as the Maxwells were allegedly witnesses to a crime. But like in Dawson and Ganwich, like in Dawson, they just come into the building, and they say, well, you're tenants, and we're investigating it for roaches, so we'll hold you incommunicado for however long. And we said that was okay. Right. So a couple points about these search warrant cases, Your Honor. One, they involved occupants at the time the search warrant was executed. The Maxwells, of course, had been removed from the crime scene about three-and-a-half hours before that. So they are no longer occupants of the premises that's being searched. At that point, of course, they're separated. There's nothing in the court's precedent that supports that separation. In fact, Dawson says you need a reasonable type of detention. And on these facts, you know, the family of the crime victim. Separation doesn't seem illogical. If you don't want witnesses, potential witnesses, conferring amongst themselves, I mean, even if who the shooter is is apparent, motivation in the context of the shooting might be important. And I can imagine concern that, gee, we don't want Kristen's relatives conferring among themselves and deciding who the bad guy is here. So why isn't that a logical thing for the officer to do? To request, it is potentially logical. There's many situations, Your Honor, where the police are allowed to request things. They're allowed to request a search of a car, but if they don't have probable cause, if the person says no, at that point, they can't search the car. The same thing with witnesses, Your Honor. They can request the witnesses to stay separate. And, in fact, a lot of the training materials that have been raised all talk about, you know, this is the preferred tactic. You should request that they remain separate. The problem here is that it became a forcible detention when the witnesses did want to be able to see each other. And that you can't do. The examples, in fact, we have, you know, the Supreme Court decision in the Litzer, I'm sorry, in the MacArthur case where there was a detention pre-search warrant, but it was very specific to the fact that there was a risk of destruction of evidence. And I think the same would apply if you could be shown that one witness was trying to bully another or change another witness's testimony. We just don't have those facts here. And we also have, it was suggested by counsel that we could just sort of have a detention as long as it was necessary to talk to these witnesses. Well, even in the Terry Stock context, at least with Terry, there's some sort of suspicion that has to support a Terry Stock context. In U.S. v. Place, the Supreme Court said, well, we won't support even a 90-minute Terry Stock detention. And, again, these are completely innocent witnesses. There's not even grounds for it. In MENA, they had that poor woman in handcuffs in the basement for four hours, and the Supreme Court said that was fine. Well, in MENA, the facts, Your Honor, in terms of what they were searching for and the risk was very different. Again, in Dawson, this Court said this detention still needs to be reasonably informed. I don't think that there's anything reasonable if the police start showing up at crime scenes where there's no question about who did it, and they start taking the victim's family, handcuffing one of them, pepper-spraying him, striking him with a baton, forcibly separating that family. I don't think that any reasonable police officer would believe it was reasonable. The prelude to the pepper-spraying. Right. He had been, well, not ordered, but he'd been told to do something. He didn't, so that's when he was pepper-sprayed. They didn't just pepper-spray. Right, but there needs to be a lawful order to stop. He was told to stop. He said, no, I'm going to go see my wife. That sort of hinges on whether they were entitled or whether it was clearly established that they couldn't, as part of their police control of the crime scene, detain and separate them. If they could, then their order to him, it wasn't clearly established that was unlawful, and then they used some force. So assuming that they were entitled to separate and detain these witnesses, would that force nevertheless be clearly established they couldn't use that level of force on him? I believe, Your Honor, that the level of force used at that point would still be excessive. We're talking about a man attempting to see his wife to tell her that their daughter had died. I don't think that any reasonable police officer would believe that it's appropriate, under that circumstance, to take out the baton, to take out the pepper spray, to place that man in handcuffs when the actual shooter, a fellow police deputy, he was never in handcuffs. He was given a cell phone, and yet we have the father of the victim as the one who ends up in handcuffs and pepper-sprayed and the like. I just don't think that any reasonable police officer would think that there was not clearly established law that that level of force was excessive. If the Court has no further questions. Thank you for the argument. We ran over with both of you. If there's some single discrete point you need to make, please make it, and then we'll move to the next case. I'll make a single discrete point, then. The most important, the real irritant, I guess you could call it, the pearl and the oyster that was probably most motivating us to take this interlocutory appeal is the part of the district court's order where he said that relying on the Ward case, that it's clearly established that you can't detain witnesses for more than a few minutes, and you don't think that they're the criminals themselves or words to that effect. And under that standard, you know, we just as well pay them money now because there's no doubt that the officers wanted these people to stay there and be interviewed. What there isn't is any evidence that they say we won't be witnesses or that we won't be interviewed. But as far as saying it's clearly established law, clearly established law, that you can't detain witnesses at a crime scene for more than a few minutes unless you know that they're the criminal, the problem is you don't know what you don't know when you don't know it. And to find out what you don't know, you have to interview people and look at the evidence. So that's how we get here. Thank you. We thank both counsel for the argument in the case against the county. And now we'll move to the case against the tribal defendants. Your Honors, with regard to this separate appeal, there's three main issues, well, two issues, but one of them has a subset that I wish to address. Our central allegation here concerns the fact that E.A. Haas, it was two of their employees who operated the ambulance who were in charge of transportation. We believe that the tribe as a whole waived its sovereign immunity. The district court, in fact, found that there was a mutual aid agreement that was entered into under California Health and Safety Code Section 13863 subpart B. We did not have that record with regard to the mutual aid agreement when E.A. Haas, the fire department, brought its original motion. We finally obtained that record as to the second round when it was the question of whether or not the employees were immune, when we had actually had a chance of discovery. But what that Health and Safety Code Section says is that a district may also enter a mutual aid agreement with any private firm, corporation, or federally recognized Indian tribe that maintains a full-time department. The firm, corporation, or federally recognized Indian tribe or any of its employees shall have the same immunity from liability for civil damages on account of personal injury or death to any person or property or damaged property. And then it goes on to say that only applies if it occurs off of Indian tribal land, which, of course, was the case in this case. This statute is a State statute, correct? Correct. And the reference to immunity presumably is to the reference to immunity under California law. Why should we decide as a result of this California legislation that a federal immunity that only Congress could abrogate is somehow abrogated by the State legislature? Because, Your Honor, in the C&L Enterprises case, the U.S. Supreme Court held that when an Indian tribe voluntarily subscribes to a State legal scheme, it can have the effect of waiving the immunity. In that case, the Indian tribe agreed to an arbitration scheme. But here they didn't agree to that. In fact, in each of their agreements, mutual aid agreements, they specifically state that they're retaining their sovereign immunity or retaining it in all but very limited circumstances. So there's no voluntary acceptance of a more broad-based waiver. Well, Your Honor, I believe there's a couple answers to that. One is to imagine if in C&L Enterprises the tribe had tried to say, well, you know, we stuck in a we're reserving our immunity, but we're agreeing to a State arbitration scheme, I actually don't think that a tribe can do both at the same time. I think that if a tribe that voluntarily chooses to subject itself to go, in this particular case, you know, off the reservation, provide services off the reservation under this mutual aid agreement, is agreeing to California law as it is. Let no good deed go unpunished? Well, Your Honor, they get benefits, too. It's a mutual aid agreement. It means that ambulances from outside the reservation can go on the reservation to aid them. And, of course, they can go off the reservation to aid people off the reservation. I just don't see the express waiver, because they don't incorporate the statute by reference, as they did in the Supreme Court decision, and they expressly retain their sovereign immunity. So where's the express waiver? Your Honor, what's required is an intentional act. It doesn't need to be in terms of what's expressed. Express is intentionally deciding to enter, whether it's into an arbitration agreement or a mutual aid agreement. But they're intentionally retaining their sovereign immunity, at least by the language in the mutual aid agreements. For example, Your Honor, in the Smith v. Hopland case that came out of the California Court of Appeal following C&O Enterprises, the tribe argued they had no intent in entering into an arbitration agreement to waive immunity. And the Court said, well, your subjective intent is all well and good, but we have an intentional act. And I think that's the same circumstance here. We have an intentional act. What intentional act reflects a willingness to give up immunity? I mean, the California statute makes no reference to restricting immunity. It appears to extend immunity. It makes no reference to the separate immunity that an Indian tribe has. So why is it, should the band of Indians even presume that by entering into a mutual aid agreement, they have a right to do anything about the federal immunity that they have? Well, as the Court knows, the starting guidance whenever we interpret a statute is its plain language. The plain language is, shall have the same immunity from liability. Not greater immunity, not lesser immunity, but the same immunity. And it does, the same State immunity. But that doesn't speak to the federal immunity at all. Well, Your Honor, if there's an additional layer of immunity, that's no longer the same immunity in our opinion. But the State doesn't have the right to do anything about the federal immunity, does it? The State has a right to create a legal scheme that if an Indian tribe voluntarily agrees to, will have the effect of waiving immunity, the same as the Arbitration Clause in C&L Enterprises. Now you've got another argument with regard to immunity. Maybe you better get to that one. All right, Your Honor. The second point here is even if there was immunity for the tribe, there's not going to be a case of individuals here, at least at this initial stage. We've sued these people in their individual capacity. The lead case that's been used by the V.A. House tribe is the Cook case. In Cook, the Ninth Circuit was very clear that Cook has sued these employees, quote, in their official capacities only. Well, in Sherman, I don't know how to pronounce that, actually. Shermoin? The suit was in the individual capacity. We said that was okay as long as the suit is really against the tribe. And I guess the opposing counsel argues, well, here it was against the tribe because originally the Maxwells were suing the tribe only, and then when that was barred, they switched gears to a suit against the individuals. Well, a couple points to that, Your Honor. Originally, the Maxwells actually sued the county, both fire departments, because they didn't know who any of the individuals' names were. There were a number of does in the complaint. That's what happens when you're victims of a crime. It's a chaotic scene. Nobody's writing down name tabs. So it was only by the first amended complaint that we could actually amend to start naming individuals in any case. But more to the point, Your Honor, once we say that we're suing them in their individual capacity, of course that's going to put us to our burden. And we believe we can meet that burden here because we have our acts that are both grossly negligent and intentional, with the intentional act being the delay of the ambulance, the grossly negligent act being the level of medical treatment. We believe both of those can take these two individuals outside of their immunity, outside the scope of their employment. It's certainly not within the scope of the employment for the paramedics to agree to delay an ambulance for 10 to 15 minutes. And, again, it was the Eos tribe who controlled that ambulance. I think we've said that the commission of a tort is not necessarily an act in the nexus of the scope of their authority. Yes, Your Honor, that's correct. Not necessarily being the key word. For example, a pure negligent act is probably not going to get you there. But, again, we're not alleging pure negligence. We're alleging gross negligence, and we're alleging an intentional act. And that certainly has the potential to get you there. In the Bagas case from the Eastern District of California, in that case you had somebody intentionally engaging in a citizen's arrest, and it was possible to proceed against that employee because they did something intentional. And, in fact, that leads me to sort of the sub-part of this issue, which is we both have the potential for suing them individually. We also have the 1983 issue here where they acted in concert with the sheriff's  And once an individual acts in concert with the sheriff's deputy, then under this court's decision, Evans v. McKay, that intentional conduct is actually under 1983, and the analysis switches from tribal sovereign immunity to not guilty. Is that in your complaint? It was not as expressly stated in our complaint as I wish. There are allegations that support it, Your Honor. We then did also raise the issue in front of the district court, and, of course, it's been briefed in our briefs here. So in terms of where the issue at least was there sufficient to put the district court on notice, especially following our briefing, to either, you know, tell us then go ahead and amend to make this more express or this is sufficient. We allege, of course, in Paragraph 9 of the complaint that these individuals were sued individually. In Paragraph 36, we allege as to the delay, as well as Paragraph 3. And then in Paragraph 38, we talk about all the defendants, including these two individuals and the sheriff's deputy, working together, causing the wrongful conduct, which included the conduct as to transportation. Sometimes, Your Honor, the facts get more specific, obviously, as discovery occurs. We were partially blocked here as to the A-House tribe's discovery, so we did the best we could on our First Amendment complaint. But the district court, by the time it issued this decision, which was just two weeks before or three weeks before it decided the county's motion, certainly had the factual record for it to show that there was a potential And we had raised that issue in our briefing. Are the paramedics accused of doing anything other than acceding to the orders given by the sheriff's deputy? Well, delaying the ambulance, which ultimately they controlled. Well, that means that they chose not to disobey the orders. I mean, your allegation is that the sheriff's deputy refused to let the ambulance leave and the paramedics didn't drive over the deputy. I've got to say, I had a little trouble seeing how the paramedics here are acting in concert for 1983 purposes or aren't becoming the fall guys because of the two-year immunity problem. But they're not doing anything they wouldn't have been doing within their job. They were there because of their job. And I don't see evidence supporting a proposition they did something beyond that. Well, of course, because we're at the pleading stage, there's a limit on how much evidence we were able to put in front of the court. But in terms of – we both have the gross negligence in terms of the medical treatment and then the intentional act. But when you act in concert, yes, if the sheriff's deputy could come forward and say, we attempted to refuse the instructions – and that's not the sheriff's deputy – if the paramedics could come forward and say, we attempted to refuse the instructions of the sheriff's deputy. Why do I have to say that? I mean, you can be cited for failing to follow a lawful order. If the deputy says, don't leave, I'm not sure what the paramedics can be expected to do. Well, Your Honor, we have these cases of the wrongful arrest, the citizen's arrest. Those people could have said, no, I'm not going to place them under citizen's arrest. They acceded to the request, what have you, of the sheriff's deputies. They end up being subject for the intentional act in 1983. If the Court has no other questions, I'll reserve the remainder of time for rebuttal. You're actually in deficit, but we'll give you a few seconds for rebuttal. Good morning, Your Honors. Philip Samoris of Hicks, Fletcher & Mack here on behalf of the Tribal Defendants, V.A. House Band of Kumeyaay Indians, Jeremy Felber, and Mr. Abhi. Joining me today in court, by the way, is the Director of Legal Affairs for the V.A. House Band, Kimberly Medgar. Your Honor, I hasten to spend too much time giving the panel's questions. I'll try. Don't trust us. But I don't want to fall into that trap, as they say. I do have a question. It seems like from our case law, there would have to be evidence that the suit was in substance against the tribe. And I understand your argument that they changed their complaint from suit to tribe. And they said that they were just attempting to get discovery to determine who was liable. How is it that the suit against these individuals in their individual capacity is in substance a suit against the tribe? Well, for a number of reasons. First, based upon precedent, the Ninth Circuit in Cook v. Abhi Casino, which I cited in my paper as a recent Ninth Circuit unanimous decision, which held that tribal immunity applied to an employee, in that case just a bar manager. We may find a specific holding that he seeks. Cook has sued Dodd and Purpow in name, but seeks recovery from the tribe. His complaint alleges that the tribe is vicariously liable for all the actions of these individuals. Now, I don't believe there was a similar statement in the complaint here. Your Honor, going on to address your question, I believe the important part of Cook, as well as its reliance upon Snow, is its very strong language that you cannot circumvent tribal immunity by the simple, this is their term, simple expedient of naming an officer. Does the tribe here have any legal obligation to indemnify the individual paramedics? It may or may not. We have not. Obviously, I'm here representing both. That question might... If it did, I can understand a natural argument saying because the tribe has to indemnify its employees, that's the tribe's treasury at risk. If there's not a legal obligation, I'm not sure it's quite the same as saying they're going to be able to reach the tribe's treasury. If the tribe's not being sued, if there's nothing that seeks to get these individuals in their official capacity, and there's not an obligation to indemnify, well, it's unfortunate, but it happens to be true that individuals... I'm a truck driver. I work for a company. I crash. I'll probably sue the company, but that doesn't mean that I'm immune from a liability. In this case, the paramedics may be on the hook for allegedly grossly negligent acts. Well, Your Honor, there's two responses to that. First, there's the practical response, the realistic response, which is by holding individual EMTs employed by Viejas personally liable for alleged torts that occur while they're clearly on duty, that will detrimentally impact the tribe insofar as its ability to recruit individuals to act as EMTs, the cost involved in trying to obtain insurance or dealing with that issue because, face it, no one's going to want to be... It's going to reduce the amount, the pool of available EMTs who want to work for the Viejas band if they find out that they're subject to individual liability. So there is a real-life impact upon the tribal government in trying to provide what is essentially a traditional, classic governmental service. And also there's precedent. The language in Cook and Snow, as well as the cases out of the Second Circuit, Frazier and Bassett, Frazier cites Bassett extensively, and it addressed allegations where the plaintiffs were saying, wait a second, we're suing you in your individual capacity. And the court said, wait a second, we're not going to play that game. And in Frazier citing Bassett, they make the statement that tribal officials, even sued in their individual capacity, are only stripped of tribal immunity when they act manifestly and palpably beyond their authority. Manifestly and palpably beyond their authority. And I suggest to you that's the standard of the test that ought to be adopted by the Ninth Circuit as well in determining when a plaintiff can state that an employee acts beyond the scope. So we'd have to make an extension of our current case law in order to reach that issue for you to win. Is that correct? Absolutely not. Under Cook and numerous Ninth Circuit authority, let me find it, Your Honor, the Ninth Circuit has consistently recognized and applied tribal immunity to tribal officers and employees as long as their alleged conduct occurred, number one, while acting within their official capacity, and number two, within the scope of their duty. That's the existing law. That's articulated in Cook v. Avi, very recent and unanimous. It's in Lenine v. Gila River, a 2002 Ninth Circuit case. It's in the well-reasoned opinion of Hardin v. White Mountain Apache, which is actually written by Justice Ferris. That's why, because I'm on this case. I think it was better. It's in Imperial Granite v. Paula. You know, there are some problems with Hardin, and you don't have to argue them now. Hardin is there, but there are some problems. I might also add, Your Honor, that Cook, which is the last word in the Ninth Circuit and unanimous in applying it to a mere employee, under this standard, which clearly Mr. Avi and Mr. Felber would satisfy. So you do not need to expand or change if the court wanted to. Well, but Cook is explicit in saying that they were sued in their official capacity and that the complaint alleges that the tribal entity was vicariously liable, which the plaintiffs in this case are carefully extracting in order to try to get around Cook. Which, as I've already responded, I think, to those concerns, why there's still real implications for the tribal government in providing an essential governmental service to allow that type of sophistry, I guess, to occur, that type of fiction, and it ought not be allowed, and I think it would be inconsistent with the spirit of Cook as well as Snow. Also, within the Ninth Circuit, if I can just finish the point, there's also, I just shepherdized the Cook v. Avi case, there's two states within the Ninth Circuit, the state of Arizona and the state of Washington, which have both followed the authority of Cook in applying immunity to employees. So there is relevant, recent, direct authority that's being followed within the Ninth Circuit and the state-level courts that this is the rule, and it's really the plaintiffs who are asking the court to depart from it, to take a step back and apply old law and old arguments that have been expressly rejected by the more recent, relevant, persuasive, and binding authority on the court. I'm sorry, Your Honor. So they make the argument that it was not in the scope of the employees' employment because they were grossly negligent. Why doesn't that argument work? Well, Your Honor, the courts in Frazier and Bassett attacked those and rejected those types of arguments for very good reasons, and that is every time a plaintiff states a claim for a tort, it has to state that the individual actor acted unreasonably in some manner, acted tortiously. So if you allow every case in which a plaintiff has to state a claim for a tort to circumvent immunity, then you may as well just do away with the immunity defense. Well, are there any circumstances where it would be so grossly negligent that it would fall outside of the scope of employment, in your view? Well, there is. I guess you're approaching is there a safety valve or some limit. I would suggest to the court that there is, and where you find that limit is in delineating what is within the scope and what is outside the scope. And even the trial court in this case looked at, we believe, the wrong law, state law in responding to its superior, and cited some general authority as to what falls within the scope and what falls outside the scope. That would provide a mechanism. I believe the more accurate and direct test would be the test articulated by, in the Second Circuit, that it has to be manifestly and palpably outside their authority. So if you want to pose some horrible hypothetical where a tribal officer has done something just utterly beyond the scope, then I believe that's your safety valve in limiting what might appear at first blush to be unlimited. I'd just hasten to ask that C&L Enterprises obviously is completely off point. In that case, the agreement that was signed was between the plaintiff and the tribe, and it specifically allowed for an arbitration with that plaintiff. Here, the mutual aid agreements are not with these plaintiffs. They're not parties to it. And all of them, by the way, which were entered into after the date of the incident, contain the express reservations, as the Court has correctly noted. And on the 1983 case, it hasn't been pled. It's not an issue here. The cases they rely upon are before Cook and Frazier and Bassett. They are just incorrect in trying to substitute a standard for waiver that just does not apply to tribal immunity. And, in fact, one of the cases they heavily rely upon, and this is my last point, the Boggess case used expressly the standard that has been rejected, and that is that tribal immunity ought to only apply to high-level officers and to discretionary acts. That's their ruling in this 1995 case, which has since been completely rejected by Cook and others. Thank you, Your Honor. Your Honors. Thank you. I will be extremely brief. You will be, yes. The Court asked whether or not counsel was trying to extend Cook. The answer is yes. We're on the pleadings here, and we've alleged that these defendants acted outside the scope of their authority. Based simply on the Cook case, that takes us outside of Cook. We're going to have to prove it up. That's always going to be the burden for plaintiffs. They've got to adequately allege it, and they've got to prove it up. So it's not as though this is a simple thing. If that alternates the Court's ruling that actions outside the scope you can still sue for, it certainly should be the ruling that is the safety valve, as it were, to ensure that there's a potential that when people go too far, whether grossly negligent or intentional misconduct, there still is a way to sue those individuals as individuals. I would note, Your Honor, a couple of quick points. The mutual aid agreements, we point to mutual aid agreements entered into prior to the acts in December of 2006. The district court found that the mutual aid agreements exist. Lastly, on Section 1983, it was this Court in the McKay case that said in footnote 9, while officials and agents of an Indian tribe do not have the same immunity as the tribe itself, saying currently tribal immunity nevertheless extends if they act in their representative capacity and within the scope, but then they say that the individual tribal defendants can be sued if they, quote, acted in concert with the police defendants whose actions we have held here to be under color of state law because then their actions cannot be said to have been authorized by tribal law. And so that's a distinct difference once we're in the 1983 realm. Thank you, Your Honor. What was the citation? The citation on that? It's footnote 9 to the Evans v. McKay case, which is a 1989 decision of this Court. It's 869 F. 2nd, 1341. The pin site is 1348, note 9. Thank you. Thank you. Thank you. We thank both counsel for the argument. The two Maxwell cases and the other cases on today's calendar submitted on the briefs are all submitted. We'll be back to talk to the students in a few minutes, and we're adjourned. All rise. This court's session stands adjourned.
judges: Farris, Clifton, Ikuta